**DEPARTMENT OF ENVIRONMENTAL PROTECTION, Petitioner,**

v.

**CITY OF PHILADELPHIA, Respondent.**

**CITY OF PHILADELPHIA, Petitioner,**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 4, 1997.

Decided April 7, 1997.

Margaret O. Murphy, Assistant Counsel, Conshohocken, for petitioner.

David A. Katz, Philadelphia, for appellee.

Before McGINLEY and FRIEDMAN, JJ., and JIULIANTE, Senior Judge.

JIULIANTE, Senior Judge.

Before us are cross-appeals filed by the Department of Environmental Protection (DEP) and the City of Philadelphia of a decision of the Environmental Hearing Board (EHB) granting in part and denying in part the City's applications for state subsidies for sewage treatment plants. We affirm in part and reverse in part.

These appeals arise under the Act of August 20, 1953, P.L. 1217, *as amended*, 35 P.S. §§ 701–703 (Act 339). Pursuant to Act 339, the Commonwealth provides an annual operating subsidy in an amount equal to 2% of the costs incurred for the "acquisition and construction" of publicly-owned sewage treatment plants. Section 1 of Act 339, 35 P.S. § 701; 25 Pa.Code § 103.24a. The amounts of the subsidies are determined by DEP in accordance with rules and regulations which Act 339 authorizes DEP to promulgate. Section 3 of Act 339, 35 P.S. § 703. As expressed in the regulations, the intent of the Legislature in enacting Act 339 was to have the Commonwealth share in the costs of the Clean Streams Program.[1] 25 Pa.Code § 103.25(b).

The City owns and operates three wastewater sewage treatment facilities for which it sought Act 339 subsidies for calendar years 1989, 1990, 1991 and 1992. DEP granted partial subsidies, but deemed certain categories of costs requested by the City to be ineligible. The City appealed the denial of these costs to the EHB, and its applications for the four years in question were consolidated. The EHB issued an Adjudication on February 13, 1996, concluding with regard to five categories of disputed costs as follows:

---

1. *See* The Clean Streams Law, Act of June 22, 1937, P.L.1987, *as amended*, 35 P.S. §§ 691.1–691.1001.

*Interest during construction.* The EHB sustained the City's appeal relating to eligibility of interest costs in excess of DEP's 1.5% historical allowance for interest during construction, agreeing with the City that neither Act 339 nor the regulations authorize a limitation on the interest to 1.5%. (Adjudication at 64–65; Conclusions of Law 5–7.)

*Supplemental engineering.* The EHB dismissed the City's claimed supplemental engineering costs associated with Plans of Operation and Operation and Maintenance Manuals. (Adjudication at 65–66; Conclusions of Law 9–12.) The EHB sustained the City's appeal with regard to engineering costs for inflow and infiltration (I & I) studies, because such studies are required by the DER Sewerage Manual. (Adjudication at 65; Conclusion of Law 8.)

*Eligible facilities.* The EHB dismissed the City's claimed costs associated with the conversion of an administrative building into a spare parts and supply warehouse, and the construction of platforms/catwalks and stairs around sludge gas storage tanks, agreeing with DEP that these costs were not acquisition and construction costs under Act 339. (Adjudication at 67; Conclusions of Law 13 and 14.)

*Indirect costs.* The EHB sustained the City's appeal relating to claimed indirect costs for certain overhead expenses associated with the construction of sewage treatment works. The EHB concluded that the City's overhead costs were appropriately included in the subsidy calculation because such costs, when incurred by an outside contractor, are included as a construction cost. (Adjudication at 67; Conclusion of Law 15.)

*Federal funds deduction.* The EHB upheld DEP's interpretation of its regulation providing for the deduction of federal grants in determining the Act 339 subsidy. (Adjudication at 67; Conclusion of Law 16.)

On appeal to this Court, the parties challenge the EHB's decision with regard to its ruling on the five categories of disputed costs, DEP's appeal addressing the I & I engineering costs, indirect costs and interest allowance, and the City's appeal addressing the costs of modifications to eligible facilities,

engineering costs for Plans of Operation and Operation and Maintenance Manuals, and the federal grant deductions. Our scope of review of an EHB decision is limited to determining whether it committed any errors of law, constitutional violations, or whether any necessary findings of fact are unsupported by substantial evidence. *T.R.A.S.H., Ltd. v. Department of Environmental Resources,* 132 Pa.Cmwlth. 652, 574 A.2d 721 (1990), *petition for allowance of appeal denied,* 527 Pa. 659, 593 A.2d 429 (1990). When reviewing the validity of an administrative agency's interpretation of its own regulation, the agency's interpretation is to be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. *Id.*

## DEP'S APPEAL

### *Infiltration and inflow studies*

As part of its Act 339 subsidy applications, the City claimed engineering costs associated with I & I studies, and with the preparation of Plans of Operation and Operation and Maintenance Manuals. DEP denied all of these costs as not being eligible costs of construction and acquisition under the statute and regulations. Although the EHB upheld DEP's denial of costs for the Plans of Operation and the Manuals, it allowed the City's costs associated with the I & I study.

Pursuant to the regulations promulgated under Act 339, the basis for the calculation of the subsidy payment is "2% of the cost of *acquisition* and *construction* of the *eligible sewage treatment works.*" 25 Pa.Code § 103.24a (emphasis added). Although "acquisition" is not defined in the statute or the regulations, "construction" is defined as follows:

Within the meaning of this act, the word "construction" shall include, in addition to the construction of new treatment works, pumping stations and intercepting sewers which are an integral part of the treatment facilities, the altering, improving or adding to of existing treatment works, pumping stations, and intercepting sewers which are essential to the sewage treatment plant system.

Section 2 of Act 339, 35 P.S. § 702; 25 Pa.Code § 103.21. "Treatment works,"

"treatment facilities," and "sewage treatment plant" are all defined in the regulations as "sewage treatment works," as follows:

> An arrangement of devices and structures for treatment and disposal of sewage, all or part of which is required, or authorized, by a water quality management sewage permit issued under The Clean Streams Law. The term includes treatment and disposal devices and structures located inside the fence surrounding the treatment works site, outfalls to the receiving stream and their appurtenances, and liquid waste disposal equipment and facilities.

25 Pa.Code § 103.21.

Engineering costs are included as construction costs, pursuant to 25 Pa.Code § 103.35, as long as they are "directly related to the construction of *eligible facilities.*" In support of its argument that the engineering costs at issue are not part of the "eligible facilities," DEP cites to the hearing testimony of the City's engineering witness. The engineer testified that I & I studies are associated with evaluating the amount of extraneous water entering the collection system and are necessary to properly design a wastewater treatment facility. (R.R. at 261a–262a.) As argued by DEP, however, the collection system is outside of the wastewater treatment plant, so the I & I study is not related to in-plant facilities. (R.R. at 287a–288a.)

In arguing that the costs of the City's I & I study should not be allowable under Act 339, DEP relies on the so-called "first connection rule" of 25 Pa.Code § 103.25(d)(1), which provides as follows:

> Interceptors which are considered integral portions of the sewage treatment works and therefore eligible for payment under the act shall include the following:
>
> That portion of an interceptor between the treatment facility and the first connection.

The Pennsylvania Supreme Court applied the first connection rule in *Northampton Bucks County Municipal Authority v. Department of Environmental Resources,* 521 Pa. 253, 555 A.2d 878 (1989), and found the regulation to be reasonable under Act 339. DEP claims that the EHB erred in not addressing the

first connection rule or the *Northampton* case in its Adjudication.

The EHB concluded that engineering costs for the I & I study should be included in the City's allowable construction costs for calculating its Act 339 subsidy because such studies are an integral part of construction rather than plant operation, which would be ineligible under 25 Pa.Code § 103.26(d)(3). As found by the EHB:

> An I & I study is a normal engineering part of the design process. (N.T. 15) [R.R. at 264a]....[The] expert opinion is that the I & I studies were necessary before Philadelphia began its major construction modification in connection with upgrading and expanding Philadelphia's existing facilities, in order to determine the volume of flow that would enter its wastewater treatment facilities. (N.T. 14) [R.R. at 263a] [The expert] would not design a facility without examining the I & I from a collection system (N.T. 14–15) [R.R. at 263a–264a]

(Finding of Fact No. 32.)

■ We are satisfied that the EHB did not err in not applying the first connection rule inasmuch as we agree with the City that the *Northampton* decision and the first connection rule are not relevant to the case before us. The City's claims do not seek subsidies for its interceptors or specific sewer lines, but costs for studies that are essential to the proper design of its wastewater treatment facilities. The fact that the studies measure water in the collection system does not render the cost ineligible under *Northampton,* based upon the above-cited Finding of Fact that the studies determine the volume of flow entering the facilities.

We also agree with the EHB's conclusion that because the Department of Environmental Resources (now DEP) Sewerage Manual requires I & I studies in the process of plant design, the cost of the study should be an allowable cost for the subsidy. A DEP witness explained that operators of treatment plants must follow the Manual in designing a facility and that infiltration and inflow must be considered in determining design flow. (R.R. at 444a–446a.) This is clearly related

to the construction of a treatment plant, not merely its operation.

We, therefore, conclude that the EHB did not err as a matter of law in determining that the City's engineering costs for the I & I studies should have been included by DEP in the calculation of the City's Act 339 subsidies.

*Indirect costs*

The next issue raised by DEP's appeal involves the City's claimed subsidies for indirect costs for overhead expenses associated with the City's and its Water Department's centralized support services, which it claims are necessary in order to acquire and construct its sewage treatment plants. As described by the EHB, a "centralized service cost" is a cost in a large organization for a service provided by another unit in the same organization, e.g., the personnel unit in the Water Department's costs for hiring all of the employees for all of the other units in the Water Department. (Finding of Fact No. 89.) Other examples are the City's Personnel Department and the Water Department's accounting staff and Materials Testing Laboratory. (Adjudication at 56.) The City claims that each of the central service units incur additional costs in order to perform that aspect of their work necessary for construction and acquisition of the sewage treatment plants, and that the costs should be included in their Act 339 subsidy calculation. DEP denied these indirect costs because it considers them general operating expenses of the City and not eligible for the subsidy.

█ In concluding that the City's claimed indirect costs are properly includable for calculation of the subsidy, the EHB relied upon the Joint Stipulations of Counsel, which contains the following agreement:

> This dispute now turns on essentially a legal issue: Although these costs are directly related to the acquisition and construction of the City's three sewage treatment plants are they ineligible under Act

339 because these costs represent the general operating costs of the City? (R.R. at 553a.) The EHB concluded that this stipulation "contains within it an agreement that these costs were directly related to construction and acquisition," and that there was no need for the City to have offered testimony to so prove. We have reviewed the record, and contrary to DEP's argument, we believe the EHB's reasoning on this issue is supported by the evidence.

We also agree with the EHB's conclusion that the costs should be allowed because they are identical to the same types of costs incurred by outside contractors building treatment facilities, which are allowed by DEP. (Conclusion of Law 15.) Because such costs are eligible for subsidy when incurred by outside contractors, if related to construction and acquisition, we do not believe the costs should automatically be disapproved if the services are performed "in-house," by City employees as part of the City's general operations.

Accordingly, we conclude that the EHB's decision allowing the indirect costs is supported by substantial evidence and not contrary to law.

*Interest during construction*

The final issue raised by DEP is whether the EHB erred in concluding that the City's *actual* interest costs should be included in its subsidy calculation, rather than the cumulative rate of 1.5% historically used by DEP. As explained in its brief, DEP derives the interest allowance by multiplying the subtotal of all other costs determined to be eligible acquisition and construction costs for the year immediately preceding the application by 1.5%, which amount is then added to the subtotal of the other eligible costs to form the basis for the subsidy calculation.[2]

Act 339 does not include any provision for the allowance of interest as an eligible cost. The regulations, however, do refer generally to the eligibility of "interest during construc-

---

2. DEP has used the 1.5% interest allowance since 1953, although it is unknown to DEP what the basis was for this rate. A DEP witness testified that he researched the issue back to the early 1950's and that "there is no written document anywhere that I could find in the State archives or in the Department's records that indicates who made the decision that it should be 1–1/2 percent or how they arrived at 1–1/2 percent, what they intended by 1–1/2 percent." (R.R. at 500a.)

tion" at 25 Pa.Code §§ 103.32 and 103.36, without specifying a rate to be applied. According to the EHB, each Act 339 application form contains a statement that the interest percent allowed by DEP is 1.5%, and the usual claim for interest is 1.5%. Obviously, the City's claim for its actual interest expense during construction is far in excess of that allowed under DEP's interpretation of Act 339.[3]

DEP argues that an increase in the interest allowance would increase the state's total outlay of funds to support the Act 339 program. We agree with the City, however, that this argument has no legal significance. The Legislature placed no limitation on the expenditure of funds under Act 339 or the regulations, which refer only generally to interest during construction as an eligible cost. Any limitation on the interest rate to be applied in the Act 339 subsidy calculation is a matter for future legislative action.

■ DEP claims that its interpretation of the regulations and application of the 1.5% interest limitation should have been given deference by the EHB. Although an agency's interpretation of its own regulations may be given controlling weight, *T.R.A.S.H., Ltd.,* we do not believe that DEP's interpretation of the regulations under Act 339 is at issue. Both parties agree that some portion of the City's interest is to be included in the subsidy calculation; the dispute is limited to the amount of that interest. Since both Act 339 and the regulations are silent on the amount of interest, there is nothing for DEP to interpret. The statute provides for a 2% subsidy on acquisition and construction costs. If the City, or any applicant, is arbitrarily limited to a 1.5% rate of interest, it will not be receiving the full subsidy to which it is entitled. As reasoned by the EHB in its Adjudication, because the regulations "do not allow DEP to calculate the Commonwealth's 2% payment on only a portion of the eligible costs, DEP's use of the 1.5% interest expense limitation is a violation of this regulation." (Adjudication at 41.)

■ Finally, DEP argues that the doctrine of administrative finality should preclude the City's challenge to its use of the 1.5% interest rate. This doctrine, which "focuses upon the failure of a party aggrieved by administrative action to pursue his statutory appeal remedy," *Kent Coal Mining Co. v. Department of Environmental Resources,* 121 Pa. Cmwlth. 149, 550 A.2d 279, 283 (1988), has been explained as follows:

> We agree that an aggrieved party has no duty to appeal but disagree that upon failure to do so, the party so aggrieved preserves to some indefinite future time in some indefinite future proceedings the right to contest an unappealed order. To conclude otherwise, would postpone indefinitely the vitality of administrative law.

*Department of Environmental Resources v. Wheeling–Pittsburgh Steel Corp.,* 22 Pa. Cmwlth. 280, 348 A.2d 765, 767 (1975), *aff'd,* 473 Pa. 432, 375 A.2d 320, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977).

We agree with the EHB that administrative finality is not at issue in this case. First of all, the City did not challenge DEP's use of the 1.5% rate or request its actual interest expenses until 1989, the first year at issue in the present appeal, and it recognizes that it has waived its right to challenge the 1.5% rate for pre–1989 decisions. *See* Appellee's Brief at 34. Accordingly, the only subsidy applications at issue are for the years which the City did appeal. There are no unappealed orders before us. As the EHB concluded on this point:

> DEP might also be correct if, in this appeal's situation, DEP had made a decision in 1953 to pay 1.5% interest in all applications ever submitted in any year in the future. However, as to the DEP 1.5% decisions as to these current applications, the evidence shows DEP made a new decision to use 1.5% again and the instant appeals are indisputably timely in regard thereto. Since there are no prior DEP decisions to apply this rate to these applications which could have been appealed and thus created the cornerstone neces-

---

**3.** The parties agree that the City's actual weighted average interest during construction financing was 8.6722% through 1991, and 7.6% for 1992.

sary to give rise to application of this doctrine, it cannot apply here.

(Adjudication at 39.)

We, therefore, agree with the EHB that DEP may not arbitrarily limit an Act 339 applicant's allowance for interest during construction to 1.5%. An applicant's actual interest costs must be utilized in calculating the amount of its subsidy.

To summarize our disposition of DEP's appeal, we will affirm the EHB's decision with regard to the City's I & I study, its indirect costs, and its interest expense claim.

## THE CITY'S APPEAL

### Eligible facilities

The City's first issue relates to the EHB's denial of claimed costs associated with converting an administration building at one of its treatment plants into a small parts warehouse, and with modifying another plant's sludge gas storage tanks to provide platforms and stairs. DEP had denied the costs as unreimbursable "operation and maintenance" expenses. The EHB agreed, concluding that the costs for these projects were not related to the sewage treatment process as required by 25 Pa.Code § 103.26(d)(1), which provides as follows:

> Expenditures not related to acquisition or construction of sewage treatment works are not eligible for payment.

> After sewage treatment works are completed and placed in operation, only expenditures for additions or modifications related to the sewage treatment process will be considered for payment.

■ The City argues that it met its burden of proving that the costs associated with converting the building were eligible under Act 339 based upon its expert testimony that small parts warehouses are common in wastewater treatment plants and that they are a necessary component of the wastewater treatment facilities. (R.R. at 281a–283a.) As the EHB concluded, however, the City's testimony established that such a facility is a necessary component of a treatment plant's operation and maintenance, not its construction. In so concluding, the EHB cited the expert's testimony as follows:

Q Is a small parts warehouse a necessary part of the construction of a sewage treatment plant?

A They are a necessary component of the wastewater treatment facilities, yes.

Q Why is that?

A To maintain and operate the facilities, you need to have parts and materials and supplies available at all times to ensure that these facilities are operating 24 hours a day, 365 days a year.

Small parts in a facility the size of Philadelphia have to be controlled. They have to be put in a place so that they are, one, kept so that they are in a secure area so they don't tend to walk or be taken offsite.

And two, that they are stored properly. Generally some of these components are sensitive to the environment so they have to be provided in the necessary and appropriate spaces for their storage.

(Adjudication at 53, quoting testimony at R.R. at 281–282a.) We agree with the EHB that this testimony supports its conclusion that the costs for the warehouse are not eligible for calculation of the Act 339 subsidy.

The City also seeks reimbursement for the costs of constructing platforms and stairs around gas sludge storage tanks, which store the gas produced in the treatment of sewage. As these modifications were not undertaken until after initial construction and operation of the tanks, the costs are subject to the requirement that "only expenditures for additions or modifications related to the sewage treatment process" are eligible for subsidy. 26 Pa.Code § 103.26(d)(1). As with the costs of the warehouse, DEP denied the City's claims for these costs as operation and maintenance expenses. The EHB agreed, concluding that DEP's narrow interpretation of the phrase "related to the sewage treatment process" was not unreasonable.

■ The City argues that the addition of the stairs and platforms around the storage tanks was an ordinary and necessary part of the storage tank and provided for their safe operation. Again, the City cited the testimony of its expert witness, who explained that the modifications necessary so that mainte-

nance crews could have safe access to the tanks' operating components, and that failure to make the modifications would have endangered maintenance employees as well as presented a danger to the entire facility due to the explosiveness of methane. (R.R. at 279a–280a.) The EHB, however, relied upon the same testimony to support its conclusion that the costs of these modifications were related to operation and maintenance, rather than construction. As the EHB concluded:

> There is no evidence from Philadelphia that proper maintenance was not performable and performed prior to this equipment's installation which might support Philadelphia's need to install this equipment. Thus, this appears to be a discretionary decision by Philadelphia to install this equipment to facilitate maintenance, i.e., to replace one method of maintenance with another. There is no suggestion by Philadelphia that this is a modification of the treatment process.

(Adjudication at 55–56.)

We conclude that the EHB's decision that the City's costs for the modifications to the gas sludge storage tanks are not eligible for the Act 339 subsidy is supported by substantial evidence, and that the EHB did not err as a matter of law in concluding that such costs are not related to the sewage treatment process as required by 25 Pa.Code § 103.26(d)(1).

*Plans of Operation and Operation and Maintenance Manuals*

The next issue raised by the City relates to the EHB's denial of engineering costs incurred for the preparation of Plans of Operation and Operation and Maintenance Manuals. Plans of Operation instruct the owner or operator of a facility on his responsibilities for the start up and operation of that particular plant, and includes training schedules, methods of financing the operation and job descriptions. (R.R. at 276a.) Operation and Maintenance (O & M) Manuals are prepared by the design engineer to provide guidelines to operators of facilities for the proper opera-

tion and maintenance of a plant. (R.R. at 277a.)

The EHB affirmed DEP's denial of the costs for the Plans of Operation and O & M Manuals, concluding that they are not necessary for the acquisition or construction of the treatment plants. The City claims that the EHB's conclusion is contrary to the evidence of its engineering witness. The engineer testified that both the Plans of Operation and O & M Manuals are necessary components in the construction of sewage treatment plants. (R.R. at 274a, 277a.) He also testified that both documents are required by the U.S. Environmental Protection Agency if an operator is to receive federal grants for the treatment plants under Title 2 of the Clean Water Act.[4] (R.R. at 274a–275a, 277a–278a.)

■ We agree with the City that the EHB erred in affirming the denial of the City's costs for preparing the Plans of Operation and the O & M Manuals. Contrary to the EHB's conclusion that the City did not meet its burden of proving that these costs are eligible under Act 339,[5] we believe the testimony of the City's engineering witness satisfied the burden of proof that the preparation of the documents was a necessary part of the construction or modifications to the sewage treatment plants. As the engineer testified:

> If an O & M Manual was not prepared, particularly with an expansion program— let's say you go from a primary to a secondary plant such as Philadelphia.
>
> Without having knowledge of how a secondary plant would operate, the operators then would have no directions or clues as to how they are supposed to perform their duties or what expectations they might have of the performance of the facility once it was in operation.
>
> So, therefore, it is to give them the necessary transfer of information, again from the designer to the operations people so that they can have a conception on how the system is to perform once they have it in place.

---

4. *See* 33 U.S.C. §§ 1251–1387.

5. Under EHB regulations, the City, as the party asserting the affirmative of an issue, bears the burden of proof. 25 Pa.Code § 1021.101(a).

(R.R. at 273a.) Although this certainly pertains to the "operation" of the treatment plants, we do not believe that this requires a conclusion that the expenses associated with the Plans and Manuals were *not* related to acquisition and construction of the eligible sewage treatment works. It would be pointless to consider any construction or modifications as being "integral" or "essential" to the treatment facilities if the instructions for the proper operation of the new construction or modifications were not prepared simultaneously.

▇ We, therefore, conclude that the EHB erred as a matter of law in determining that the City did not meet its burden of proving that the expenses for preparing the Plans of Operation and the O & M Manuals were not eligible for calculation of the City's Act 339 subsidy.[6]

### Federal grant deductions

The final issue raised by the City is whether the EHB erred in affirming DEP's methodology for the calculation of federal grant deductions taken from the Act 339 subsidy calculation. Under 25 Pa.Code § 103.26(b), federal grants are to be deducted from eligible Act 339 costs to arrive at the grantees' actual costs of acquisition and construction. According to this regulation, "[c]alculation of these deductions shall be based on the ratio of *eligible construction costs under the act* to the *construction costs paid for with State or Federal grant funds or PENNVEST loan funds.*"[7] The dispute is over DEP's interpretation and application of the phrase "construction costs" in this ratio. The City received 34 federal grants for the construction of its sewage treatment plants, under Title II

of the Clean Water Act, and claims that DEP deducted an improper amount for the grants.

As described by the City's accounting witness, each federal grant received by the City is broken down into four cost categories: construction costs, engineering costs, indirect costs and other direct costs. (R.R. at 307a–308a.) DEP's methodology is to take the ratio of the federal eligible *construction* costs, and none of the costs in the other three categories, to the Act 339 eligible construction amount. (Findings of Fact Nos. 124 and 126.) Accordingly, DEP's interpretation of the ratio established in 25 Pa.Code § 103.26(b) would be configured as follows:

*Eligible Act 339 Construction Costs Category*

Eligible Federal Construction Costs Category

DEP then applies this "construction cost category" ratio to all other cost categories of the project (engineering, indirect and other direct costs) in calculating the federal grant deduction. The City claims that the denominator of the ratio should be a broader "Eligible Federal Costs Category," without the qualification imposed by limiting it to construction costs. It argues that application of the narrow construction cost category ratio to all other cost categories penalizes rather then subsidizes the City.[8]

▇ The City does not challenge the validity of the regulation governing the federal grant deductions. The issue, therefore, narrows to which interpretation of the regulation should be applied—the City's or DEP's. As recognized by the EHB, although the dispute focuses on the City's contention that DEP's definition of "construction" is too narrow, the

---

6. In so holding, we are not agreeing with the City's argument that the costs of preparing the Plans and the O & M Manuals should be subsidized because they are required under federal law. As the EHB concluded, merely because the EPA mandates such documents' preparation by those receiving federal grants, does not make this an Act 339 eligible cost.

7. PENNVEST is the Pennsylvania Infrastructure Investment Authority Act Program, established by the Act of March 1, 1988, P.L. 82, *as amended*, 35 P.S. §§ 751.1–751.20.

8. To illustrate its position, the City presented three hypothetical examples of Act 339 calcula-

tions, involving federal grant deductions, to the EHB. (Exhibits G, H and I of the Joint Stipulation, R.R. at 572a–574a.) According to the City, the examples show that it actually ends up with a reduced Act 339 subsidy when it spends additional funds for engineering or other costs not included in the federal construction category. The City claims that it is penalized for spending money on construction in those situations where a portion of the work is federally funded, but DEP either refuses to recognize the work as eligible under Act 339 or DEP's funding percentage is less than the federal percentage.

City does not suggest a definition other than that contained in Section 2 of Act 339, 35 P.S. § 702, or in 25 Pa.Code § 103.21, or any other that is broader than that utilized by DEP. Under the statutory and regulatory definitions, "construction" is limited to new treatment works which are an integral part of the treatment facilities and additions to existing treatment works which are essential to the sewage treatment plant system. Because the word "construction" has been defined in Act 339, we are constrained, as was the EHB, to apply that definition and not a "common sense" definition as advocated by the City. *See Appeal of Neshaminy Auto Villa, Ltd.,* 25 Pa.Cmwlth. 129, 358 A.2d 433 (1976) (court is bound by statutory definition although such definition may be different from ordinary usage); Section 1921(a) and (b) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a) and (b).

■ The City argues that the EHB was not required to defer to DEP's interpretation of 25 Pa.Code § 103.26(b), under *Twining Village v. Department of Public Welfare,* 105 Pa.Cmwlth. 227, 523 A.2d 1199, 1201 (1987), wherein this Court reiterated the general proposition that "[a]n agency's interpretation of its own regulation will be given judicial deference where it is not clearly erroneous or inconsistent with the regulation interpreted and where it is consistent with the policy and objectives of the authorizing statute." According to the City, because DEP's calculation of the federal grant deduction is a discretionary action, the EHB was bound to the standard of review set forth in *Warren Sand & Gravel Co., Inc. v. Department of Environmental Resources,* 20 Pa.Cmwlth. 186, 341 A.2d 556 (1975). In *Warren Sand,* we held that where DEP is acting with discretionary authority, rather than mandatory authority, then the EHB *may* substitute its discretion for DEP's. As this Court has since held, however, under *Warren Sand* the EHB is not *required* to substitute its discretion for DEP's, and may decide not to do so. *Western Hickory Coal Co. v. Department of Environmental Resources,* 86 Pa.Cmwlth. 562, 485 A.2d 877 (1984.)

In this case, whether or not the federal grant calculation is a discretionary action on the part of DEP, the EHB certainly was not bound to substitute DEP's interpretation of how that calculation should be performed with its own interpretation or any other. Regardless, it is clear that the EHB did not simply "defer" to DEP's interpretation of 25 Pa.Code § 103.26(b). It affirmed DEP's calculation only after independently considering all of the evidence and concluding that the City did not prove that DEP's calculation of the deduction was erroneous. Because the City has not proved why DEP's application of the construction cost category ratio is inconsistent with the regulation or that its interpretation is clearly erroneous, we agree with the EHB's conclusion that DEP's interpretation should be followed. As summarized by the EHB:

> Philadelphia has clearly shown us that the regulations may be read two ways (as it does and as DEP does) but it has failed to show us DEP's interpretation is in error. It is not enough to state the Act's purpose to the Board and to say if Philadelphia's interpretation of statute and regulations is used, it provides the city with a greater subsidy. Philadelphia must show us DEP's interpretation of Section 103.26(b) is clearly erroneous or we will defer to it.

(Adjudication at 64.) We, accordingly, affirm the EHB's decision upholding its calculation.

## CONCLUSION

In sum, we affirm the EHB's decision with regard to the eligibility of the I & I engineering costs; the indirect, overhead costs; the use of the City's actual interest expense as opposed to the 1.5% rate historically allowed by DEP; the denial of costs for the warehouse and the modifications to the gas sludge storage tanks; and DEP's calculation of the federal grant deductions. We reverse the EHB's decision with regard to the denial of engineering costs for the Plans of Operation and the Operation and Maintenance Manuals.

## ORDER

AND NOW, this 7th day of April, 1997, the order of the Environmental Hearing Board dated February 13, 1996 is affirmed in part

and reversed in part, consistent with the foregoing opinion.